MASELLI, MILLS & FORNAL, P.C.
By: David Fornal, Esquire
Attorney ID 017002005
Melissa M. Nelson, Esquire
Attorney ID 379062021
400 Alexander Park, Ste. 101
Princeton, New Jersey 08540
(609) 452-8411
Attorneys for Plaintiff, First Bank

| | |
|---|---|
| In re<br><br>EVESHAM MORTGAGE, LLC<br><br>      Debtor.<br><br>_____<br><br>FIRST BANK,<br><br>      Plaintiff,<br><br>v.<br><br>LANDCOR HOLDINGS, L.P., and DOUGLAS S. STANGER, TRUSTEE,<br><br>      Defendants. | UNITED STATES BANKRUPTCY COURT<br>DISTRICT OF NEW JERSEY<br><br>CHAPTER 7<br><br>Case No.: 23-18880-ABA<br><br>Adversary No.: 24-01168<br><br>Civil Action |

## BRIEF IN SUPPORT OF PLAINTIFF'S MOTION
## FOR SUMMARY JUDGMENT

Of Counsel and on the Brief:
DAVID FORNAL, ESQUIRE
MELISSA M. NELSON, ESQUIRE

**PRELIMINARY STATEMENT**

First Bank ("the Bank") respectfully requests that this Court grant summary judgment in its favor. First Bank is a perfected, secured creditor with a first priority lien against the personal property of Evesham Mortgage, LLC (the "Evesham"). Although Landcor Holdings, L.P. ("Landcor") claims that it has a superior interest over certain personal property by way of a constructive trust as a matter of law, a constructive trust does not take priority over another party's perfected, secured interest. Additionally, Landcor has failed to set forth any facts that it is the true owner of certain personal property belonging to Evesham, so, factually, Landcor does not have a constructive trust over such property.

**FACTUAL HISTORY**

**The Bank's Loan to Evesham**

On June 26, 2013, Evesham entered into a Promissory Note (the "Note") and Commercial Loan Agreement with the Bank to evidence a commercial revolving draw loan (the "Loan") in the amount of $75,000.00, with interest accruing at a variable rate equal to the Wall Street Journal Prime Rate plus 1.25%, with an initial rate of 4.5% per annum, with monthly payments of accrued interest commencing July 26, 2013, and the entire balance of all principal, interest, costs and fees due and payable to the Bank on a maturity date of December 26, 2014.

The Commercial Loan Agreement included various representations and warranties made by Evesham in connection with the Loan. In particular, Section 4 of the Commercial Loan Agreement indicates as follows:

> 4. **WARRANTIES AND REPRESENTATIONS.** I make to you the following warranties and representations which will continue as long as this Loan is in effect, except when this Agreement provides otherwise.

> A. **Power.** I am duly organized, and validly existing and in good standing in all jurisdictions in which I operate. I have the power and authority to enter into this transaction and to carry on my business or activity as it is now being conducted and, as applicable, am qualified to do so in each jurisdiction in which I operate.
>
> …
>
> H. **No Other Liens.** I own or lease all property that I need to conduct my business and activities. I have good and marketable title to all property that I own or lease. All of my Property is free and clear of all liens, security interests, encumbrances and other adverse claims and interests, except those to you or those you consent to in writing.
>
> I. **Compliance With Laws.** I am not violating any laws, regulations, rules, orders, judgments or decrees applicable to me or my property, except for those which I am challenging in good faith through proper proceedings after providing adequate reserves to fully pay the claim and its challenge should I lose.

To secure the obligations of the Note, on June 26, 2013, Evesham executed and delivered to the Bank a Security Agreement (the "Security Agreement") and thereby granted the Bank a security interest in personal property (the "Collateral"). In particular, the Security Agreement indicates that the Collateral comprises the following:

> All assets, including all inventory, equipment, accounts (including but not limited to all health-care-insurance receivables, chattel paper, instruments (including but not limited to all promissory notes, letter-of-credit rights, letters of credit, documents, deposit accounts, investment property, money, other rights to payment and performance, and general intangibles (including but not limited to all software and all payment intangibles); oil, gas and other minerals before extraction; all oil, gas, other minerals and accounts constituting as-extracted collateral; all fixtures; all timber to be cut; all attachments, accessions, accessories, fittings, increases, tools, parts, repairs, supplies, and comingled goods relating to the foregoing property, and all additions, replacements of and substitutions for all or any part of the foregoing property; all insurance refunds relating to the foregoing property; all good will relating to the foregoing property; all records and data and embedded software relating to the foregoing property, and all equipment, inventory and software to utilize, create, maintain and process any such records and data on electronic media; and all supporting obligations relating to the foregoing property; all whether now existing or hereafter arising, whether now owned or hereafter acquired or whether

now or hereafter subject to any rights in the foregoing property; and all products and proceeds (including but not limited to all insurance payments of or relating to the foregoing property.

The Security Agreement states:

4. **WARRANTIES AND REPRESENTATIONS.** I make to you the following warranties and representations which will continue as long as this Agreement is in effect:

> E. **Ownership of Property.** I represent that I own all of the Property. Your claim to the Property is ahead of the claims of any other creditor, except as disclosed in writing to you prior to any advance on the Secured Debts. I represent that I am the original owner of the Property and, if I am not, that I have provided you with a list of prior owners of the Property.

The Bank perfected its security interest in the Collateral by filing a financing statement with the State of New Jersey, Department of the Treasury on July 5, 2013. On June 7, 2018, the Bank ensured that its interest remained perfected by filing and recording a UCC Financing Statement Amendment. The Bank ensured that its interest remained perfected by filing and recording a UCC Financing Statement Amendment. The Bank filed a secured proof of claim with preservation of rights under 11 USC 506(b) for post-petition interest, costs, and fees. As of the petition date, the Debtor had an outstanding balance of $384,185.51 plus per diem interest of $89.59, other charges in accordance with the terms of the Agreement, attorneys fees and costs.

The terms of the Loan Documents provide that, in the event any payment is more than ten (10) days late, the Bank may charge a late charge of 5.00% of the amount of the delinquent payment, or $25.00, whichever is greater.

On October 11, 2023, Evesham filed a petition for relief under Chapter 7 of the United States Bankruptcy Code under petition number 23-18880 (the "Petition"). Defendant Douglas S. Stanger (the "Trustee") was the trustee appointed to the Evesham's bankruptcy case.

**Evesham's Business and Involvement with Landcor**

Prior to filing bankruptcy, Evesham was operating as a mortgage lender in New Jersey, Pennsylvania, Illinois, Tennessee and Florida. As a non-depository lender, Evesham needed a minimum amount of capital to comply with the mandates of its licensing programs and state regulators. In New Jersey, Evesham was required to maintain a minimum net worth of $250,000 to obtain licensure as a mortgage lender. Under federal law, to participate in federally backed loan programs, including FHA loans, a duly-licensed lender is required to demonstrate a minimum net worth of at least $1 million. 24 U.S.C. § 202.5(n).

Landcor is a Pennsylvania limited partnership that made investments with Evesham in exchange for an equity stake in Evesham's mortgage lending business and for periodic payments. Landcor is a party to this case by virtue of two instruments that appear of record, with both instruments asserting an interest by way of a constructive trust in the assets of Evesham.

According to its Amended Complaint filed in the Superior Court of New Jersey, Burlington County, Law Division (Docket No. L-854-20) (hereinafter the "State Litigation Amended Complaint")[1], in 2011, Evesham's principal, Richard Brown ("Brown"), entered into conversations with Landcor principal Iva Samost ("Samost") regarding the possibility of Landcor investing in Evesham. Specifically, Landcor alleges that "[Evesham] sought to have a $1 million or greater investment account set aside, so that [Evesham] could comply with Federal and/or State Regulations relating to the mortgage business in order to evidence sufficient capital to conduct its business and activities." (Amended Complaint, ¶ 12). Landcor further alleged that "[T]he

---

[1] Beginning in 2020, Landcor initiated a series of lawsuits in state court against the Evesham and multiple other defendants that eventually resulted in a consolidated matter before the Superior Court of New Jersey under docket nos. BUR-L-1619-20 and BUR-L-854-20. Thereunder, Landcor alleged that Evesham and its principals violated the New Jersey Revised Uniform Limited Liability Company Act, including allegations of minority member oppression, breach of contract, promissory estoppel, breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, fraud, conversion, improper distributions, fraudulent inducement, and default of a promissory note.

investment account that Landcor had set aside was to be a separate account, so as to meet any required minimum reserve requirements of Evesham under State/Federal Law and Regulations." (Amended Complaint, ¶ 14). Ultimately, in or around 2011, Landcor invested approximately $1 million in Evesham and entered into a contract memorializing the agreed-upon terms.

**Evesham's Bankruptcy Petition**

Schedule A/B of the Petition disclosed a standard brokerage account (the "Wells Fargo Account") with Wells Fargo Clearing Services, LLC d/b/a Wells Fargo Advisors ("Wells Fargo") for a total amount of approximately $800,000.00. Pursuant to a subpoena, Wells Fargo produced 1,008 pages of records for the account identified by the debtors, ending in 3769. The records produced reflect, *inter alia*, transfers of stock from a TD Ameritrade account held in the name of Evesham to the Wells Fargo account *also* held in the name of Evesham.

The Wells Fargo account comprises the most significant portion of Evesham's assets. As of February 26, 2025, there remains due and owing to the Bank the principal balance of $379,426.13, interest of $53,753.13, late charges in the amount of $2,548.70 and attorneys fees of $26,628.29 for a total of $419,364.78. Since the value of the Collateral on the petition date was in excess of the amount due to the Bank on that date, in accordance with 11 U.S.C. Section 506(b), the extent of the Bank's security interest includes post-petition interest and attorney fees.

**STATEMENT OF LAW**

I.   **THE BANK IS ENTITLED TO SUMMARY JUDGMENT BECAUSE THE BANK MAINTAINS A FIRST PRIORITY SECURED INTEREST IN WELLS FARGO ACCOUNT.**

The Bank is entitled to summary judgment because it maintains a perfected, secured interest in the Wells Fargo Account. The standard for summary judgment is set forth in the Federal Rules of Civil Procedure. Pursuant to Rule 56(a), a court shall grant a movant's motion for

summary judgment if the movant shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P., R. 56(a). In order to prevail on its motion for summary judgment, a movant must show that its material cited does not establish a presence of a genuine dispute or that the nonmovant cannot produce admissible evidence to support a genuine dispute. Id. at (c).

In analyzing the application of Fed. R. Civ. P. 56, the seminal case of Celotex Corp. v. Catrett set forth the analysis and standard courts utilize for considering summary judgment motions. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The Celotex court indicated that a party's motion for summary judgment should be granted "so long as whatever is before the court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. The Court further articulated that a "principal purpose" of the summary judgment rule is to "isolate and dispose of factually unsupported claims or defenses." Id. at 323-24. Finally, the Celotex court indicated that a moving party's burden under Fed. R. Civ. P. 56 may be "discharged" by "pointing out to the court" that there is an "absence of evidence to support the nonmoving party's case." at 325.

The determination of property rights, including the priority of mortgage liens, is defined by state law. Butner v. United States, 440 U.S. 48, (1979).

As explained in greater detail below, the Bank has a perfected, security interest in the Wells Fargo Account. That security interest takes priority over any interest Landcor may have. Since Landcor has failed to demonstrate that it possesses a constructive trust that may take priority over the Bank's secured interest in the Wells Fargo Account, the Bank is entitled to immediate relief because there is an "absence of evidence to support [Landcor's] case."

A. **The Bank Maintains a Perfected, Secured Interest in Evesham's Wells Fargo Account,**

The Bank has a perfected, security interest in Evesham's Wells Fargo Account. A creditor has an enforceable security interest against a debtor when (a) the debtor receives value in exchange for giving the creditor a secured interest in the debtor's collateral, (b) the debtor retains rights in the collateral, and (c) the debtor authenticates a security agreement that provides a description of the collateral. N.J. Stat. § 12A:9-203(b). According to New Jersey's version of the Uniform Commercial Code, the term "investment property" includes a "securities account." N.J. Stat. § 12A:9-102(a)(49).

To perfect its security interest in investment property, a secured party may file a financing statement. N.J. Stat. § 12A:9-312(a). A financing statement must include the name of the debtor, the name of the secured party, and the collateral covered by the financing statement. N.J. Stat. § 12A:9-502(a).

Here, Schedule A/B of the Petition identifies the Wells Fargo Account as a brokerage account. The Security Agreement created the Bank's security interest in the Wells Fargo Account. Pursuant to the terms of the Note and Commercial Loan Agreement, Evesham received a loan from Bank. Further, Evesham retained rights in the Wells Fargo Account. Finally, a representative for Evesham signed the Security Agreement. The Security Agreement indicates that First Bank receives a secured interest in all of Evesham's investment property. Since the Wells Fargo Account is a brokerage account, it is a securities account, and is, therefore, considered investment property. Ultimately, the Bank has a secured interest in Evesham's Wells Fargo Account.

To perfect its interest in the Wells Fargo Account, the Bank filed a financing statement with the State of New Jersey, Department of the Treasury on July 5, 2013. The financing statement

identified Evesham as the debtor and the Bank as the secured party. The financing statement also identified that the Bank has a security interest in all of Evesham's investment property. On June 7, 2018, the Bank ensured that its interest remained perfected by filing a UCC Financing Statement Amendment. On January 12, 2023, the Bank ensured that its interest remained perfected by filing a UCC Financing Statement Amendment.

For these reasons, the Bank has a perfected security interest in Evesham's Wells Fargo Account.

### B. A Constructive Trust Does Not Take Priority Over a Party's Perfected, Secured Interest in Bankruptcy.

Landcor's alleged constructive trust interest in the Wells Fargo Account is not superior to the Bank's interest because a constructive trust does not take priority over a party's perfected, secured interest. A constructive trust is a form of equitable relief that arises when a person holding title to property is subject to an equitable duty to convey it to another on the ground he would be unjustly enriched if he were permitted to retain it. *Wolff v. Tzanides (In re Tzanides)*, 574 B.R. 489, 517 (Bankr. D.N.J. 2017).

The Bankruptcy Code does not provide that a constructive trust is carved out from a debtor's bankruptcy estate. As an equitable remedy, principles of equity govern the application of a constructive trust. The principles of equity that serve to impose a constructive trust *also* serve to prohibit the elevation of the claim of one creditor above that of similarly situated creditors. In a bankruptcy, all similarly-situated creditors are similarly disadvantaged. The bankruptcy code and its codified priority of distribution seeks to insure the equal treatment of all similarly situated creditors. Giving preference to claims arising pursuant to a constructive trust would undermine and frustrate that objective. *See Gemini Trust Co., LLC v. Genesis Glob. Cap., LLC (In re Genesis*

*Glob. Holdco, LLC)*, 658 B.R. 31, 57-58 (Bankr. S.D.N.Y. 2024) ("Courts recognize that by creating a separate allocation mechanism outside the scope of the bankruptcy system, the constructive trust doctrine can wreak havoc with the priority system ordained by the Bankruptcy Code."). *See also Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Secs. Llc*, 654 B.R. 224, 237 (Bankr. S.D.N.Y. 2023) ("[C]onstructive trusts are anathema to the equities of bankruptcy since they take from the estate, and thus directly from competing creditors, and not from the offending debtor.") (internal citations and quotations omitted); *In re Dreier, LLP*, 429 B.R. 112, 137 (Bankr. S.D.N.Y. 2010) ("Because the constructive trust in bankruptcy harms other creditors rather than the debtor, the equities that will support the imposition of a constructive trust under the common law do not necessarily support imposition of the same constructive trust in bankruptcy."); *In re Chowaiki*, 593 B.R. at 720 ("In the context of bankruptcy, where . . . liabilities generally outweigh assets, a court must consider the equities of all creditors in determining whether there was unjust enrichment.") (internal citations and quotations omitted).

Accordingly, the existing priority scheme accounts for the equities in a fundamentally disfavorable situation for all creditors. Pursuant to that scheme, secured creditors have priority in a bankruptcy distribution above unsecured creditors. 11 U.S.C.A. § 507, et. seq. Changing this priority would invert the principles of equity the bankruptcy code exists to protect. *See, e.g., In re Chowaiki*, 593 B.R. at 721 ("No equities would be served here by allowing Plaintiff to satisfy his losses while similarly situated creditors, many of whom hold similar causes of action against Evesham for fraud and fraudulent inducement, wait for pro rata distribution."); *In re Ades & Berg Grp. Inv'rs*, 550 F.3d 240, 245 (2d Cir. 2008) ("There is no inequity in treating [the creditor-plaintiff] in the same manner as any other depositor/creditor who was unfortunate enough to have placed its money with the [debtor]."); *In re Dreier LLP*, 2016 U.S. Dist. LEXIS 92322, 2016 WL

3920358, at *7 (S.D.N.Y. July 15, 2016) ("Equity is not served by disadvantaging one set of victims in order to restore another, where the only source of assets is limited to a common pool."); *In re Dreier LLP*, 429 B.R. at 134 ("The right of a Ponzi scheme victim . . . to gain priority over other victims, is severely limited."); *cf. In re Ades*, 550 F.3d at 244 ("[R]etention by [a] bankruptcy estate of assets that, absent bankruptcy, would go to a particular creditor is not inherently unjust.").

Landcor merely alleges that it has a constructive trust over Evesham's Wells Fargo Account. If Landcor has a constructive trust, that interest is subordinate to the Bank's perfected, secured interest.

C. **Landcor's Claims Are Not the Proper Subject to a Constructive Trust.**

Under the facts, Landcor does not have a constructive trust in the Wells Fargo Account. The assets in the Wells Fargo account were held in the name of Evesham, were transferred from an account held in the name of Evesham, and were utilized by Evesham in the operation of its mortgage lending business. Evesham was not merely holding property for the benefit of Landcor; the funds invested by Landcor were an *investment* in Evesham that simply did not pay dividends. In fact, Landcor's own Amended Complaint indicates that such funds were invested for a 5% interest in Evesham's annual profits and/or losses and commissions on each of the total closed loans in the amount of ten basis points. (Amended Complaint, ¶ 13). In that regard, Landcor is no different than any other creditor.

Landcor's reasons for the investment are important to note. Under New Jersey law, all persons acting as residential mortgage lenders, residential mortgage brokers, or mortgage loan originators are required to be licensed, and all licensees as a residential mortgage lender must demonstrate that they have a tangible net worth of at least $250,000. N.J. Stat. § 17:11C-64. The other states where Evesham was licensed as a mortgage lender impose comparable requirements.

However, to participate in highly desirable federal housing initiatives and programs, including, but not limited to, FHA loans, a lender must demonstrate a net worth of not less than $1 million, plus an additional net worth of one percent of the total volume, in excess of $25 million, of FHA single family insured mortgages originated, underwritten, purchased, or serviced during the prior fiscal year, up to a maximum required net worth of $2.5 million. 24 U.S.C. § 202.5(n). Landcor bought into Evesham's business with the expectation that additional investment would enable significant new lending opportunities which would, in turn, multiply the earnings of both Evesham and Landcor. In fact, by its own admission in its State Litigation Amended Complaint, Landcor asserts that the investment account that Landcor allegedly set aside for Evesham was so that Evesham could meet "any required minimum reserve requirements … under State/Federal Law and Regulations." (Amended Complaint, ¶ 14).

Without Landcor's investment, Evesham would not have been able to qualify as an FHA lender. That financial vitality inures to the benefit of borrowers, lenders and the government alike, but also plainly benefitted both Evesham and Landcor. Participating in federally sponsored programs opens up myriad opportunities in the mortgage lending industry that are otherwise precluded. Accordingly, Landcor's investments in Evesham were not of a type where the money was being held for Landcor; Evesham was not acting as custodian of Landcor's money. Rather, it was a way for Landcor to satisfy the licensing requirements. If the money did not belong to Evesham, for use by Evesham in the conduct of its business, Evesham and Landcor made material misrepresentations to the regulatory agencies.

The representations made by Evesham demonstrate that the funds in the Wells Fargo Account were the property of Evesham, not Landcor. Pursuant to Section 4A of the Commercial Loan Agreement, Evesham represented that it had the power and authority to carry on its business

as it was currently being conducted in each jurisdiction it was operating in. Further, Evesham represented in Section 4I of the Commercial Loan Agreement that at the time that it was entering into the Commercial Loan Agreement, it was not violating any laws, regulations, rules, orders, judgments or decrees applicable to Evesham or its property. If the funds within the Wells Fargo Account truly were not the property of Evesham, it would not only be defrauding the regulatory agencies in control of licensing mortgage lenders, it would also be making material misrepresentations within the Commercial Loan Agreement. For these reasons, the Court must grant the Bank's motion for summary judgment.

      **D.**      **The Chapter 7 Trustee, Douglas S. Stanger, Must Pay the Bank's Secured Claim from Evesham's Bankruptcy Estate.**

In accordance with the US Bankruptcy Code, the Chapter 7 Trustee, Douglas S. Stanger, must pay the Bank's secured claim from Evesham's bankruptcy estate. 11 U.S.C. § 725 provides that "after the commencement of a case, under this chapter, but before final distribution of property of the estate under section 726 of this title, the trustee, after notice and a hearing, shall dispose of any property in which an entity other than the estate has an interest, such as a lien, and that has not been disposed of under another section of this title." The Trustee has previously represented that he collected assets of Evesham of approximately $800,000 including, but not limited to, the Wells Fargo Account. As demonstrated herein, the Bank has a secured claim against the Wells Fargo Account. The Bank's lien has not yet been paid, has not been disposed of and continues to incur interest, costs and fees as an over-secured credit under 11 U.S.C. §506(b). For these reasons, the Court must compel the Chapter 7 Trustee, Douglas S. Stanger, to pay the Bank's secured claim.

## **CONCLUSION**

For the foregoing reasons, the Court must grant summary judgment in favor of the Bank and against Landcor.

                                        MASELLI, MILLS & FORNAL, P.C.
                                        *Attorneys for Plaintiff, First Bank*

Date: February 28, 2025        By:    */s/ Melissa M. Nelson*
                                                 MELISSA M. NELSON